UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFERY DeANGELIS,<br>    Plaintiff, | : | CASE NO. 3:18-cv-755 (MPS) |
| v. | : | |
| DEVONIA LONG, et al.,<br>    Defendants. | : | MAY 9, 2018 |

**INITIAL REVIEW ORDER**

Plaintiff Jeffery DeAngelis, currently incarcerated at the Osborn Correctional Institution in Somers, Connecticut, filed this case under 42 U.S.C. § 1983 asserting claims for violation of various constitutional and federal rights. He names ten defendants: ADA Coordinator Devonia Long, Captain Luis Colon, Commissioner Scott Semple, the Department of Correction, Warden Gary Wright, Captain Griffin, Richard Furey, Dr. Monica Farinella, Dr. Mahoob Ashraf, and Correctional Managed Health Care.

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless whether the prisoner pays the filing fee.[1] *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing

---

[1] The plaintiff paid the filing fee to commence this action.

*Carr v. Dvorin*, 171 F.3d 115 (2d Cir. 1999) (per curiam)). Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

In addition, Federal Rule of Civil Procedure 20(a)(2) permits the joinder of multiple defendants in a single action if two criteria are met: first, the claims "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences"; and second, "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "What will constitute the same transaction or occurrence under the first prong of Rule 20(a) is approached on a case by case basis." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted). As the Second Circuit has observed in the Rule 13 context,[2] whether a counterclaim arises out of the same transaction as the original claim depends upon the logical relationship between the claims and whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).

I.  Allegations

---

[2] "In construing the term 'transaction or occurrence' under Rule 20, many courts have drawn guidance from the use of the same term in Rule 13(a), applying to compulsory counterclaims." *Barnhart v. Town of Parma,* 252 F.R.D. 156, 160 (W.D.N.Y. 2008) (citation omitted).

2

A. Conditions in Q Buildings

From November 2014 through April 2015, the plaintiff was confined in the Q-buildings at Osborn Correctional Institution ("Osborn"). ECF No. 1, ¶ 6. During that time, he was required to drink dirty water containing H-pylori, PCB's, lead, and arsenic. *Id.*, ¶ 7. The cells contained high levels of PCB's and toxic amounts of black mold. *Id.*, ¶ 8. On December 7, 2016, and December 11, 2016, correctional officers stated on televised news that the buildings were being closed because of unsafe conditions including the presence of PCB's and asbestos. *Id.*, ¶ 9. During 2011 and 2012, TRC performed tests at various locations around the Q-buildings. The tests showed toxic levels of PCB's and asbestos. *Id.*, ¶ 10. When the plaintiff returned to Osborn on September 29, 2017, he learned that the Q-buildings had been closed. *Id.*, ¶ 11. Commissioner Semple has been aware of the conditions at Osborn since 2011-12, but continues to house inmates at Osborn. *Id.*, ¶ 135.

B. Housing Assignments/ADA Claims

The plaintiff walks with a cane and experiences severe pain from degenerative disc disease and a disc protrusion displacing the S1 nerve root. *Id.*, ¶ 14. Upon his return to Osborn, the plaintiff was assigned to E-block, the housing unit farthest from the dining hall and medical unit. *Id.*, ¶ 12. He was required to walk the length of two football fields to the dining hall and one football field to the medical unit. *Id.*, ¶ 13.

Inmates are permitted twenty minutes to get to the dining hall and eat their meals. *Id.*, ¶ 15. By the time the plaintiff reached the dining hall, it was closed. He was required to return to his cell without a meal. *Id.*, ¶ 16. On October 1, 2017, the plaintiff explained the situation to Captain Colon and asked to be moved to B-block which was closer to the dining hall and

3

medical unit. *Id.*, ¶ 17. Captain Colon refused the request for transfer and told the plaintiff to deal with the situation. *Id.*, ¶ 18.

To enter the shower in E-block, the inmate must step over a 30" wall. The shower contains no railings or mats to prevent inmates from falling. *Id.*, ¶ 19. The plaintiff asked Captain Colon for a handicap shower, explaining that recently he had fallen in a non-handicap shower at another correctional facility. *Id.*, ¶ 20. Captain Colon denied the request. *Id.*, ¶ 21. On October 8, 2017, the plaintiff submitted a request for accommodation to Americans with Disabilities Act Coordinator Long seeking permission to use the handicap shower in the medical unit. *Id.*, ¶ 22.

On October 10, 2017, the plaintiff submitted another request seeking a second accommodation, a single cell. *Id.*, ¶ 23. The plaintiff experiences urinary incontinence. Incidents of incontinence have caused problems with several past cellmates and resulted in assaults by two prior cellmates. *Id.*, ¶¶ 24–25.

Although departmental directives provide that a response to a request for reasonable accommodation should be received within two business days, the plaintiff received no response to either request for five weeks. On November 17, 2017, he resubmitted the requests. *Id.*, ¶¶ 26–28.

Dr. Wright ordered that the plaintiff utilize a catheter connected to a leg bag to collect urine. *Id.*, ¶ 126. This was the reason for the request for a single cell. ADA Coordinator Long has ignored these requests since November 2017. *Id.*, ¶ 127. The plaintiff wrote to Warden Wright complaining about the lack of response for five months. *Id.*, ¶ 128. When he spoke to Warden Wright on April 18, 2018, the plaintiff was merely referred to ADA Coordinator Long

4

and Captain Colon. *Id.*, ¶ 129.

On November 22, 2017, the plaintiff fell in the E-block shower, slamming his head and elbow. *Id.*, ¶¶ 29–30. After submitting numerous requests, the plaintiff saw Dr. Breton on December 4, 2017, for his injuries. *Id.*, ¶ 31. Dr. Breton gave the plaintiff a pass to use the shower in the medical unit. *Id.*, ¶ 32. Dr. Breton told the plaintiff that ADA Coordinator Long had never spoken with him regarding the ADA request. *Id.*, ¶ 33. The plaintiff also spoke to Dr. Breton about his request for a single cell and the danger posed by his medical condition. *Id.*, ¶ 34. Dr. Breton indicated he would speak to Captain Colon and ADA Coordinator Long. *Id.*, ¶ 35. In October and December 2017, Dr. Breton made several notes about the plaintiff's need for a single cell. *Id.*, ¶ 92. On January 29, 2018, Dr. Wright noted that he would follow up with ADA Coordinator Long about a single cell. *Id.*, ¶ 93.

On November 28, 2017, the plaintiff submitted a grievance regarding the distance from his housing location to the dining hall and medical unit. *Id.*, ¶ 37. On December 15, 2017, the plaintiff submitted a grievance complaining that his ADA requests were not answered. *Id.*, ¶ 36. On December 18, 2017, the plaintiff again asked Captain Colon to transfer him to B-block. The plaintiff showed Captain Colon the shower pass complaining about the distance he had to walk to shower. Captain Colon refused the request. *Id.*, ¶¶ 39–40. On December 22, 2017, Captain Colon told the plaintiff that the warden had ordered his transfer to B-block because of the grievance. *Id.*, ¶ 41.

C. Conditions of Confinement

During the time he was in E-block, the plaintiff was unable to go to the dining hall or outside recreation and was required to use the dangerous E-block shower. *Id.*, ¶ 42. To get

5

outside, inmates had to negotiate twenty steep concrete steps. There were sixteen steps to get to the gym. There are no ramps. *Id.*, ¶ 43. As a result, disabled inmates in E-block are confined to their cells for 23 hours per day. *Id.,* ¶ 44. There were broken windows in E-block that were covered with plastic garbage bags or cardboard. As a result the inmates were exposed to freezing temperatures. Inmates also were exposed to black mold, asbestos, and toxic water. *Id.*, ¶¶ 45-46. The water caused heartburn and the plaintiff frequently woke up vomiting. *Id.*, ¶ 47.

The cell in B-block was filthy and covered with mold. *Id.*, ¶ 48. Within two weeks of his arrival in B-block, the plaintiff began getting sick. He was coughing up blood and experiencing itchy eyes, headaches, and skin irritation. *Id.*, ¶ 49. On January 5, 2018, the medical unit provided him allergy tablets. *Id.*, ¶ 50. The plaintiff continued to cough up blood. On January 11, 2018, he was prescribed Mucinex. *Id.*, ¶ 51. The plaintiff believes that he suffered from toxic mold poisoning. *Id.*, ¶ 52.

On February 28, 2018, the plaintiff was incontinent and urinated over himself and his cellmate's sneakers. In response, his cellmate punched the plaintiff in the face and repeatedly kicked him. *Id.*, ¶ 53. On March 20, 2018, the plaintiff was moved to J-one, a dormitory room without walls or privacy. *Id.*, ¶¶ 54-55. The bathroom is one room with two toilets and three urinals. *Id.*, ¶ 56. There are no stall doors or walls between the urinals, leaving the plaintiff no privacy to clean himself should he be incontinent. *Id.*, ¶ 57. Other inmates and staff of both sexes can view inmates using the bathroom. *Id.*, ¶ 58. The bathroom ceiling leaks used toilet water from the bathroom above onto the sink and toilet area. *Id.*, ¶59. The dormitory also is infested with rodents. *Id.*, ¶ 60-61. On April 3, 2018, inmates at Osborn were served cereal with live bugs in it. *Id.*, ¶¶ 81-82.

6

There are birds in C-block. The birds fly through the bars on the cells and leave bird droppings in the cells and throughout the block. *Id.*, ¶ 124. On Tuesdays, Osborn conducts staff training. As a result, inmates are fed in their cells. The food carts are only inches above the floor where the bird droppings are located. *Id.*, ¶ 125. When the plaintiff asked Warden Wright for a transfer because of the conditions, Warden Wright laughed and stated that he would have to transfer everyone. *Id.*, ¶ 130.

D. <u>Discontinuance of Medication</u>

Since 2014, the plaintiff had been taking Lyrica for nerve pain. *Id.*, ¶ 62. On March 20, 2018, Dr. Farinella informed the prison pharmacy that the medication was being denied. *Id.*, ¶ 63. Dr. Farinella stated that Lyrica was not part of a "habeas agreement" and recommended Neurontin or capsaicin. *Id.*, ¶ 65. The plaintiff was called to the medical unit and informed of the decision. *Id.*, ¶ 64. The plaintiff told the nurse that there was no habeas agreement. He had taken Neurontin from 2012 through 2014 while at Garner Correctional Institution, until the doctor there obtained approval for Lyrica from the Utilization Review Committee. *Id.*, ¶ 66. The nurse said she would inquire further. *Id.*, ¶ 67.

While leaving the medical unit, the plaintiff spoke to Health Services Administrator ("HSA") Furey. *Id.*, ¶ 68. When he explained what had happened, HSA Furey told the plaintiff he would have seizures if he suddenly stopped taking Lyrica. *Id.*, ¶ 69. HSA Furey called Dr. Wright to his office. Dr. Wright agreed to override Dr. Farinella's denial and ensure that the plaintiff received Lyrica, commenting that withdrawals from Lyrica were very dangerous. *Id.*, ¶ 70. The plaintiff continued to receive Lyrica for the next eight days. *Id.*, ¶ 71.

On March 29, 2018, the plaintiff was called to the medical unit and seen by Dr. Ashraf, a

newly hired physician. *Id.*, ¶ 72. Dr. Ashraf told that plaintiff that Dr. Farinella had discontinued the prescription for Lyrica. *Id.*, ¶ 73. Dr. Ashraf said there was nothing he could do and prescribed capsaicin cream, an over-the-counter medication used to treat minor aches and pains. *Id.*, ¶ 74. HSA Furey was disbelieving and asked Dr. Ashraf if he was going to "detox" the plaintiff. Dr. Ashraf responded that he would take care of the plaintiff. *Id.*, ¶ 75. Later that day, the plaintiff received no medication. The nurse told the plaintiff that Dr. Ashraf had discontinued the Lyrica. *Id.*, ¶ 76. The plaintiff continued to receive no medication. He began to experience symptoms of withdrawal including headaches, fever, nausea, diarrhea, sweating, chills, and extreme pain. He was unable to move, walk, sleep, or eat. *Id.*, ¶ 78. After five days, on April 3, 2018, the plaintiff was called to the medical unit. When he was unable to move, a nurse brought him 200 mg of Lyrica. She told the plaintiff that the medical unit had made an error and that he would be tapered off the medication. *Id.*, ¶ 79. The plaintiff alleges that HSA Furey, Dr. Farinella, Dr. Wright, and Dr. Ashraf were aware of the dangers of immediately stopping Lyrica. *Id.*, ¶ 80. In April 2018, Dr. Farinella again stopped the plaintiff's medication. *Id.*, ¶ 83.

  E. Provision of Medical Services

The Department of Correction ("DOC") had a contract with Correctional Managed Health Care ("CMHC") to provide health care to Connecticut prisoners. *Id.*, ¶ 84. CMHC has established a Utilization Review Committee ("URC") to oversee inmate care. All doctors' orders must be approved by the URC before the care is provided. *Id.*, ¶ 85. The plaintiff believes that the goal of CMHC and the URC is to maximize profit by preventing doctors from treating patients in the most medically appropriate manner. *Id.*, ¶¶ 86, 88, 110. The contract

with CMHC was terminated after several inmates died. *Id.*, ¶ 87. Although the plaintiff has been diagnosed with Hepatitis-C, he has not been provided any medication to treat or cure the disease because of the cost. *Id.*, ¶ 89. The plaintiff and other inmates are not being provided physical therapy, even though physical therapy is contemplated in DOC directives. *Id.*, ¶ 91. DOC and CMHC have assigned an insufficient number of medical staff to treat the inmates at Osborn. The known exposure of inmates to PCB's, asbestos, H-pylori-infected water, black mold, rodents, and insects necessitates the availability of prompt medical care. *Id.*, ¶¶ 95-97.

On July 21, 2017, Dr. Pillai diagnosed the plaintiff as suffering from plantar fasciitis, a torn ligament in his right foot. *Id.*, ¶ 98. Dr. Pillai ordered shoe inserts for the plaintiff to reduce pain. *Id.*, ¶ 99. The plaintiff never received the inserts. *Id.*, ¶ 100. Dr. Wright submitted a URC request for shoe inserts on January 29, 2018. The URC denied the request. *Id.*, ¶ 101. The URC, CMHC and DOC have denied annual cardiac testing ordered by the plaintiff's cardiologist. *Id.*, ¶ 103. That decision was not changed when the plaintiff wrote to the medical unit complaining of chest pain. *Id.*, ¶ 104.

Per the policy of DOC and CMHC, the plaintiff's Neurontin is crushed into powder and the Lyrica capsules are opened. This prevents the plaintiff from receiving the full prescribed dose. *Id.*, ¶ 131-32.

On April 20, 2018, Dr. Ashraf saw the plaintiff for a severe rash. Dr. Ashraf diagnosed an allergic reaction to black mold. *Id.*, ¶ 105. The same day, Dr. Ashraf told the plaintiff that the shoe insoles were denied. *Id.*, ¶ 106. When the plaintiff asked him to appeal the URC denial, Dr. Ashraf said that he did not know how to appeal. *Id.*, ¶ 107. The plaintiff attributes this response to a lack of training by DOC and CMHC. *Id.*, ¶ 108, 111. When the plaintiff asked Dr.

9

Ashraf about Hepatitis-C medication, Dr. Ashraf said that the plaintiff did not need medication because people can live for years with Hepatitis-C. *Id.*, ¶ 109.

F.   Disclosure of Medical Information

On April 6, 2018, HSA Furey asked Captain Griffin to move the plaintiff to B-block so he would be close to the dining hall and the medical unit. *Id.*, ¶ 113. In making this request, HSA Furey disclosed confidential medical information regarding the plaintiff's urinary incontinence. *Id.*, ¶ 114.

On April 11, 2018, the plaintiff was returned to B-block. *Id.*, ¶ 115. On April 18, 2018, Captain Griffin told the plaintiff that B-block was not a medical unit and that he had to have a job to stay in the unit. Captain Griffin said that he was transferring the plaintiff out of the unit because the plaintiff was disabled and unable to work. *Id.*, ¶ 117. The plaintiff explained that Captain Manning and HSA Furey had moved him to the unit. The plaintiff asked to stay because he was unable to keep moving his property due to his disability. *Id.*, ¶ 118. Captain Griffin stated that he was not going to make one of his workers share a cell with someone who urinates on himself. *Id.*, ¶ 119. Many inmates heard the exchange. *Id.*, ¶ 120. On April 19, 2018, the plaintiff was transferred to C-block, which is further from the medical unit and dining hall. *Id.*, ¶¶ 121, 123. Inmates have been harassing him because of his urinary incontinence. *Id.*, ¶ 122.

II.   Analysis

The plaintiff describes ten claims in his complaint. Defendants Long, Colon, and Wright discriminated against him by housing him in units far from the dining hall and medical unit and forcing him to use a non-handicap shower for over two months. *Id.*, ¶ 137. The plaintiff was on a list for a job wiping tables in B-block but defendant Griffin denied him the opportunity to work

10

because of his disability. *Id.*, ¶ 138. Defendants Furey and Griffin caused the plaintiff to be harassed and ridiculed by revealing his personal medical information. *Id.*, ¶ 139. Defendants Long, Colon, Wright, and Griffin were deliberately indifferent to the plaintiff's medical needs when they forced the plaintiff to live in housing units distant from the medical unit even though the plaintiff was sent to Osborn on a medical transfer. *Id.*, ¶¶ 140-41. The DOC policy regarding denial of medication for Hepatitis-C is a serious threat to his health and safety in violation of the Eighth Amendment. *Id.*, ¶ 142. Defendants Long, Colon, Wright, and DOC have discriminated against him by failing to provide a ramp so he, a disabled inmate, can go outside. *Id.*, ¶ 143. Defendants Ashraf, Farinella, and Furey were deliberately indifferent to his health by suddenly stopping Lyrica. *Id.*, ¶ 144. The conditions of confinement, including black mold, insect and rodent infestation, birds, toxic water, and asbestos, violate the Eighth Amendment. *Id.*, ¶¶ 145. 147. Defendants Wright, Colon, Long, and Furey failed to protect the plaintiff from abuse and harassment by failing to investigate the assault claims, transfer the plaintiff or respond to his ADA requests for accommodation. *Id.*, ¶ 146. Defendants Ashraf and Farinella committed medical malpractice by suddenly stopping Lyrica. *Id.*, ¶ 148. Although some of these claims overlap, several are distinct.

The Court has grouped the allegations into six categories that would support the following claims: (1) unconstitutional conditions in the Q-buildings prior to 2015; (2) failure to accommodate disabilities in violation the Americans with Disabilities Act and Rehabilitation Act and discrimination because of the plaintiff's disability; (3) unconstitutional conditions of confinement in E-block, B-block, C-block, and J-one in 2017 and 2018; (4) sudden discontinuance of Lyrica; (5) general provision of medical services and challenge to CMHC-

11

DOC contract; and (6) disclosure of private medical information. Thus, the allegations support at least six separate claims. These claims do not arise from the same occurrences and do not share common questions of law or fact. For example, the discontinuance of medication claim involves only defendants Farinella and Ashraf, and the disclosure of medical information claim involves only defendants Furey and Griffin. As the claims do not need to be resolved in one lawsuit, they are improperly joined. *See Wilson v. McKenna*, No. 3:12-cv-1581(VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (fact that all defendants injured plaintiff insufficient to warrant joinder).

Because the Second Circuit has expressed a preference for adjudicating cases on their merits, it will generally find failure to grant leave to amend an abuse of discretion where the sole ground for dismissal is that the complaint does not comply with rules governing joinder. *See, e.g.*, *Salahuddin v. Cuomo,* 861 F.2d 40, 42–43 (2d Cir. 1988) (dismissing with leave to amend appropriate where complaint fails to comply with Rule 8's requirement of a short and plain statement but pleads some cognizable claims); *Wilson*, 2015 WL 1471908, at *6 (advising plaintiff that improperly joined claims must be pursued in separate actions). Accordingly, the plaintiff is hereby directed to file an amended complaint that complies with Rule 20 of the Federal Rules of Civil Procedure. The amended complaint should include only one distinct claim and shall list only the defendants involved in that claim in the case caption.

III.    Conclusion

The plaintiff shall file an amended complaint including only one of the six claims within twenty days from the date of this order. Failure to timely file an amended complaint that complies with this order will result in the dismissal of this action. If the plaintiff wishes to

12

pursue the other claims, he may do so in separate actions.

**SO ORDERED** this 9th day of May 2018 at Hartford, Connecticut.

/s/
Michael P. Shea
United States District Judge